IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| CONSUELO MALECEK and MARK MALACEK,<br><br>        Plaintiffs,<br><br>vs.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,<br><br>        Defendant. | No. C04-0012-LRR<br><br>**ORDER** |

_____

## *I. INTRODUCTION*

On January 6, 2004, Plaintiffs Consuelo Malacek and Mark Malacek (the "Malaceks"), a married couple, filed a Petition against Defendant State Farm Mutual Automobile Insurance Company ("State Farm") in the Iowa District Court in and for Linn County. In such Petition, the Malaceks claim a breach of contract (Count 1) and a bad-faith claim denial (Count 2) on the part of State Farm. The Malaceks' claims stem from an automobile accident in which Consuelo Malacek ("Consuelo") allegedly was injured and from State Farm's subsequent denial of underinsured motorist ("UIM") coverage. On January 30, 2004, State Farm removed the action to federal court pursuant to 28 U.S.C. § 1441, alleging federal diversity subject matter jurisdiction under 28 U.S.C. § 1332 inasmuch as the parties are citizens of different states and there exists more than $75,000 in controversy.

The matter before the court is State Farm's Motion for Partial Summary Judgment (docket no. 22) on Count 2 of the Malaceks' Petition. Also before the court is the

Malaceks' Cross-Motion for Partial Summary Judgment on Count 2 of the Malaceks' Petition (docket no. 25). Both Motions are resisted. The court held a hearing on both Motions on May 10, 2005. The Malaceks were represented by attorneys Thad Collins and Matt Novak and State Farm was represented by attorneys Mike Weston and Brenda Wallrichs. The matters therefore are fully submitted and ready for decision.

## II. FACTUAL BACKGROUND

The Malaceks are insured under an automobile insurance policy with State Farm which provides for various coverages including UIM benefits and medical payments. The Malaceks purchased UIM benefit limits of $100,000 and medical payments coverage of $25,000.

The Malaceks' insurance policy with State Farm provides:

> We will pay damages for *bodily injury* an *insured* is legally entitled to collect from the owner or driver of an *underinsured motor vehicle*. The *bodily injury* must be caused by an accident arising out of the operation, maintenance or use of an *underinsured motor vehicle*.
>
> THERE IS NO COVERAGE UNTIL THE LIMITS OF LIABILITY OF ALL BODILY INJURY LIABILITY BONDS AND POLICIES THAT APPLY HAVE BEEN USED UP BY PAYMENT OF JUDGMENTS OR SETTLEMENTS.

Plaintiffs' Appendix in Support of Resistance to Defendant's Motion for Partial Summary Judgment and in Support of Plaintiffs' Cross-Motion for Summary Judgment ("Pl. App.") at 2 (emphasis in original).

Consuelo was involved in an automobile accident on or about April 26, 2002. The accident occurred on Edgewood Road N.W. in Cedar Rapids, Iowa. Consuelo's vehicle was the fourth in a line of vehicles. Consuelo's vehicle had come to a complete stop when her vehicle was struck from behind by a vehicle driven by Thomas Buckallew

("Buckallew"). At or about the same time, Buckallew's vehicle was struck from behind by a vehicle driven by Diep Huynh ("Huynh").

Three days after the accident, Consuelo gave a recorded statement to Amy Wertzer, of Allied Insurance, Buckallew's automobile insurance carrier, in which she stated:

> AW: Okay, can you go ahead and give me the date and approximate time that the accident took place?
> CM: It was Friday, umm April 26th.
> \* \* \*
> CM: It was on Edgewood going onto Roger. I was the fourth vehicle waiting for the first vehicle to make the turn when all of a sudden I felt and [sic] impact.
> \* \* \*
> CM: I saw glass shattering all over. Umm, prior to that when I was coming I saw a police vehicle that was, was in the right hand lane ticketing a driver for some traffic violation so all of the traffic was detoured to the left lane.
> \* \* \*
> CM: So I was the fourth in line just waiting for that vehicle to make the turn.
> AW: Okay, did you feel one or two impacts[,] do you know?
> CM: I felt at first I felt the impact that you know made my chest hit against the steering wheel.
> AW: Okay
> CM: And then I felt the jolt in my back.
> \* \* \*
> AW: So you felt two of them then?
> CM: Yeah.
> AW: You felt one where your chest went into the steering wheel?
> CM: Right.
> AW: Then you felt a second one that kind of jarred your back?
> CM: Right.
> AW: Okay, all right, those were the only two that you felt,

>                    correct?
> CM:   That I can recall, but I saw, immediately felt the pain in
>          my lower back, my shoulder, my chest.

Defendant's Appendix in Support of Motion for Partial Summary Judgment ("Def. App.") at 10-11. Consuelo also indicated in her statement she could "remember one major impact and that was the one when [she] you know . . . he hit [her] in the back and [she] went forward and saw glass just flying all over." Def. App. at 14. She also stated she recalled one major impact on the back and that her seat in her car bent forward as a result of that impact. Def. App. at 14.

State Farm paid for Consuelo's medical expenses and claimed a right to subrogation. Jennifer Larson ("Larson"), the State Farm employee who handled Consuelo's claim for medical expenses, sent a letter to Buckallew on April 29, 2002 to advise him of State Farm's subrogation rights. Larson did not send letters to any other driver to advise the driver of State Farm's subrogation rights.

On September 16, 2002, Consuelo sued Buckallew in the Iowa District Court in and for Linn County, alleging he was at fault for the injuries Consuelo suffered in the accident. Buckallew then filed a third-party petition against Huynh seeking contribution.

On November 25, 2002, Deputy Richard Yoder ("Yoder"), of Yoder Reconstruction and Consultation, presented his conclusions regarding Consuelo's automobile accident. Yoder concluded the amount of damage to the rear of Consuelo's vehicle was consistent with an initial impact, and "[t]he small amount of damage to [Buckallew's] vehicle . . . does not allow for the scenario that [Buckallew's] vehicle . . . was struck first by [Huynh's] vehicle . . . and then pushed into [Consuelo's] vehicle. . . ." Yoder further noted, "Mr. Schmidt of vehicle #3 [(the vehicle in front of Consuelo's)] stated that he felt a heavy impact and then a lighter impact. These two impacts are consistent with the first impact by [Buckallew's] vehicle . . . and then the

4

lighter impact by [Huynh's] vehicle. . . ." Pl. App. at 28.

Consuelo also testified in her deposition on January 13, 2003, she heard "like tires or something. I don't know what it was. I just heard something in the back." Def. App. at 25. Consuelo further testified she was struck from behind after she heard the tires screeching. Def. App. at 25.

On January 13, 2003, Buckallew testified in his deposition he struck Consuelo's vehicle because he was struck from behind by the vehicle operated by Huynh. Def. App. at 5. Buckallew testified he struck Consuelo's vehicle only after his vehicle was rear-ended by Huynh's vehicle, which caused him to then rear-end Consuelo's vehicle. Def. App. at 5. Buckallew also testified that prior to being struck by Huynh, he was "feathering" the clutch of his vehicle and he would have been able to stop and would not have hit the rear of Consuelo's vehicle if his vehicle had not been struck from behind by Huynh. Def. App. at 4. Buckallew further testified in deposition that, although he immediately applied his brakes once Huynh hit his vehicle, his brakes did not have a chance to lock up because his vehicle "lunged" into the rear of Consuelo's vehicle after it was hit by Huynh's vehicle. Def. App. at 5. Buckallew also testified he did not tell the police officer at the scene of the accident that he had hit Consuelo's car first - Buckallew stated he first came to the opinion that the accident was Huynh's fault "[w]hen she hit [him] and [his] foot slipped off the clutch after [he] calmed down at the house and was replaying the scenario." Pl. App. at 14. Buckallew stated he lives two blocks from the scene of the accident, and he reached his conclusion regarding the cause of the accident when he got home and had a chance to reflect on what had happened. Pl. App. at 15. He testified he made this conclusion prior to making the telephone call to his insurance company to inform it of the accident. Pl. App. at 15.

Huynh testified at her deposition she did not see brake lights or emergency lights

on Buckallew's vehicle prior to striking his vehicle and she thought his vehicle was still moving when she approached it. Def. App. at 36. Huynh testified she saw Buckallew's vehicle strike Consuelo's vehicle before she struck Buckallew's vehicle. Def. App. at 36. She further testified she could not see the car in front of Buckallew. Def. App. at 36-37. Huynh also testified she was clear that Buckallew's pickup truck hit the car in front of him before Huynh hit Buckallew's pickup truck. Def. App. at 38. Finally, Huynh testified she was traveling about 30 miles per hour when she struck the rear of Buckallew's vehicle. Def. App. at 39.

On March 14, 2003, Consuelo's attorney, Darin Luneckas, sent a letter to Larson at State Farm in which he updated Larson on the status of Consuelo's liability claim against Buckallew. Pl. App. at 38. Luneckas stated he believed Allied Insurance, Buckallew's insurance carrier, was nearing the time at which they would offer the limits of Buckallew's coverage, $25,000. Pl. App. at 38. Luneckas stated he wanted to be sure Consuelo's UIM claim was preserved and asked that Larson call or write him with the information State Farm needed from Buckallew before State Farm gave Luneckas written authority to settle the claim against Buckallew. Pl. App. at 38.

On April 29, 2003, Luneckas sent to Larson via facsimile Yoder's report regarding Consuelo's accident and his curriculum vitae. Luneckas indicated on the cover page of the facsimile:

> Here is Deputy Yoder's report and CV. It's pretty self-explanatory as to what happened and the fact that Diep Huynh's contact with Buckallew's back bumper had nothing to do with my client's injuries. She has consistently stated that she felt one large impact and then a tap. That has not been contested and is asymmetric with the position that the sixth vehicle caused the original impact. If that WERE the case, there would have only been one collision to be felt by cars four and three. Let me know if you need the Huynh deposition. It

6

> says, to summarize, that Buckallew slammed into my client and that she bumped him due to the immediacy of his stopping. The only person to report that Diep was at fault was Buckallew, who had an interest in doing so. Two disinterested parties in the front vehicles state it happened the way my client says, and have no reason to be untruthful.

Pl. App. at 39.

On June 11, 2003, Larson made the following notes in State Farm's claim activity log:

> [C]ontacted Atty Chris Bruns; he was not sure if PD resolved w/ Allied and n/i; he stated that essentially they had agreed to pay their liability lim[it]s of $25,000 and atty Luneckas has not asked for add'l monies on the property damage; he stated that they also questioned liability; Mr. Buckallew still contends that he had his foot on the clutch and was slowing when struck from behind and pushed into Malacek and then Malacek's 2nd impact was w/ the vehicle in front of her; however, he stated that other stories go against Buckallew's stmt and Buckallew will not make best witness (apparently was very angry and defensive in depo) and as low limits Allied made decision that best to offer limits; he stated that if they [would] have had higher limits, that they most likely would have challenged; he also advised that Diep Hyunh's [sic] carrier has agreed to contribute $1000 to this $25,000 settlement if guarantee her release on settlement; therefore Atty Luneckas has to agree to release both in order to receive the $25,000[.]

Def. App. at 51.

On June 12, 2003, Luneckas sent to Larson via facsimile the notes Luneckas took while interviewing the people in the vehicles in front of Consuelo's vehicle at the accident scene who served as disinterested third-party eye witnesses in this matter. Luneckas stated in his note to Larson on the cover sheet, "I hope this and all of the other reasons I've plead become enough to allow our dismissal of Diep Huynh. Please call as soon as you have a

7

final decision. I've called Chris [Bruns, the attorney for Allied Insurance,] to let him know you guys want Huynh off the general release to be signed by my client and her husband, Mark." Pl. App. at 40.

On June 12, 2003, Larson made notes in the claim log regarding State Farm's position about which individual was liable for the harm caused to Consuelo in the car accident. She noted:

> c-spoke with Atty Luneckas; advised that we are willing to release [c]lmt Buckallew (Allied) but at this point I feel there is more negligence on Diep Huynh and feel that her policy should come in to play; he states that he did not bring Clmt Huynh in from the beginning as all his investigation was leading to clmt Buckallew; I advised that even if Diep is thought to have contributed 10% to this accident that their offer of $1000 does not seem appropriate; Atty Luneckas seems very anxious to get [this] matter concluded and I got the impression that he seemed a little confused as how to proceed as it is my understanding that Allied's payment is contingent on insd also releasing West Bend [Mutual, Huynh's insurance company]; I also pointed out that he would owe our sub lien; he mentioned that he thought we would just want to consider that in negotiation and have it reduce final underinsured settlement; . . . . Atty Luneckas continues to argue no fault on Diep Huynh; he wants her released so that he can accept pymt of the $25,000 ([$]24,000 from Allied and $1,000 from West Bend); he stated that parties in front of insured stated that they were looking in rearview mirror and saw Buckallew hit first; I advised that I would like to review their stmts; he then stated that he actually interviewed them over the phone and then typed up a summary; he will send them; I agreed to continue to consider releasing Diep Huynh based on add'l info provided[.]

Pl. App. at 18.

On June 13, 2003, Larson sent to Luneckas a letter in which she indicated State

Farm gave its permission for the Malaceks to release Buckallew and his insurance carrier from further liability. Pl. App. at 23. Larson stated in her letter "[a]s we discussed, we are not, at this time, allowing you to release Diep Huynh or her insurance company, West Bend Mutual." Pl. App. at 23. Larson further indicated State Farm would look to be reimbursed for two-thirds of the payments it had made under the Medical Payments Coverage from any recovery the Malaceks received from Buckallew's insurance carrier.

On June 17, 2003, Luneckas sent to Larson a facsimile in which he stated:

> By now you have had the chance to review the witness statement notes I sent over last week. To clarify our position on your resistance to our releasing Diep Huynh, I am in agreement with Mr. Bruns (see attached letter) regarding your company's obligation to establish any damages attributable to the negligence of a party we did not and would not sue. I suggest you either immediately either [sic] (1) provide us with a release letter on both Huynh and Buckallew; or (2) send a copy of the policy language which you believe supports an insurance company's withholding of a release letter due to it's [sic] opinion that a third party is at fault. If it comes down to Malacek v. State Farm on the underinsurance claim, your outfit would be free to argue that Diep Huynh caused damages to the extent you feel your obligation should be reduced on the overall claim. If that jury gives her 30% of the fault, your exposure would be proportionately reduced. See Iowa Code § 668.5. Please call me about this for some resolution before the end of the week. My client has waited quite a while for this part of the case to be resolved.

Pl. App. at 24. In a letter to Luneckas dated June 13, 2002, Bruns indicated it was Allied's understanding State Farm would have to establish that Huynh was responsible for the damages Consuelo allegedly sustained as a result of the accident. Bruns stated, "Unless State Farm can establish that Diep Huynh's collision with Mr. Buckallew's vehicle actually had some effect on your client and actually worsened or caused injuries, State

Farm will not be entitled to the benefit of Ms. Huynh's policy limits." Pl. App. at 26.

On June 26, 2003, Al Flanagan, Larson's supervisor, placed the following comment in the Malaceks' claim file:

> Jen, we discussed file this am. We agreed you will contact insd.'s atty. to see what limits are on Huynh and propose possible negl. of up to 1/3 on Huynh. Apply that % to limits and see if that exceeds potential value of claim with limits of other party. This would hopefully stimulate a demand. We discussed possible negot[i]ation of our MPC sub. claim, also.

Pl. App. at 19.

On September 27, 2003, Larson conducted a telephonic interview of Consuelo. Consuelo indicated during her interview she recalled she had been stopped waiting for cars to make a left hand turn when she was struck from behind. Def. App. at 20. She recalled one major impact and a second insignificant impact. Def. App. at 20. Consuelo stated the first impact pushed her into the car in front of her and crushed the glass in her car and, thereafter, she felt a second minor impact. Def. App. at 20. Consuelo also stated that Buckallew had told her at the scene of the accident that he was struck by the vehicle behind him and that is why he struck Consuelo's car. Def. App. at 20.

Larson testified in her deposition that State Farm eventually gave the Malaceks consent to settle with Huynh's insurance carrier and told Luneckas State Farm would not deny the Malaceks UIM benefits based upon the settlement. Def. App. at 46. Larson further testified she communicated to Luneckas that, in spite of State Farm's acquiescence in the Malaceks' settlement, State Farm still might take the position Huynh was at least partially at fault for the accident, based upon the results of State Farm's investigation. Def. App. at 46.

The record reflects State Farm received the following information from Luneckas: (1) the deposition testimony of Consuelo, Buckallew and Huynh; (2) photographs of the

10

vehicles involved in the accident; (3) Yoder's accident reconstruction report; and (4) statements from the drivers in front of Consuelo's vehicle. Larson also received information from Bruns which revealed Buckallew was not a credible witness and Buckallew was the only person who claims he was slowing when he was struck from behind by Huynh. Bruns also advised Larson that if Buckallew's liability insurer had more money at stake, it would have fought Consuelo's attempt to impose liability on Buckallew and actively would have prosecuted its contribution claim against Huynh. The only interview or direct investigation State Farm performed into the facts of the accident was to take a recorded statement from Consuelo. Both Larson and Flanagan, her supervisor, believed their position that Huynh could be at fault for the accident found support in the information they received from Luneckas and Bruns. The record reflects that Larson had spoken with Joe Skvor, a claims adjuster for West Bend Mutual, Huynh's insurance company, who stated he did a thorough investigation and did not find any fault on the part of Huynh.

On November 26, 2003, Larson sent Luneckas a letter in which she notified Luneckas State Farm was going to deny the Malaceks' claim for UIM benefits. Larson stated: "Upon review of the listed items, I do feel that Huynh could be perceived by a jury as being 50% or more at fault for this accident. Therefore, joint and several liability would be applicable." Def. App. at 58. The Malaceks subsequently filed the instant lawsuit against State Farm on January 6, 2004.

### III. LEGAL ANALYSIS

#### A. *Summary Judgment Standard*

Summary judgment is appropriate only when the record, viewed in the light most favorable to the nonmoving party, shows there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Carter*

*v. Ford Motor Co.,* 121 F.3d 1146, 1148 (8th Cir. 1997) (citing *Yowell v. Combs*, 89 F.3d 542, 544 (8th Cir. 1996)). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir. 1999). In considering a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus.*, 475 U.S. at 587. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Id*.

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 394 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and, by depositions, affidavits or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### B. First-Party Bad Faith Claims Under Iowa Law

The court's consideration of whether either party is entitled to summary judgment on the Malaceks' bad faith claim begins with a review of the principles of bad faith under Iowa law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) (determining federal courts whose jurisdiction is based solely upon diversity must apply the substantive law of the state in which they sit). In order for an insured to prevail on a first-party bad faith claim against

12

his or her insurance carrier, the insured must prove by substantial evidence: (1) the absence of a reasonable basis for denying or terminating benefits of the insurance coverage; and (2) that the defendant insurer knew or had reason to know that its denial or termination was without basis. *Dirks v. Farm Bureau Mut. Ins. Co.,* 465 N.W.2d 857, 860 (Iowa 1991); *Dolan v. AID Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988). *See also Kiner v. Reliance Ins. Co.,* 463 N.W.2d 9, 12 (Iowa 1990) ("To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim."). The first element of the test for bad faith on the part of an insurer is objective, while the second part of the test is subjective. *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 657 (Iowa 2002). A reasonable basis for denying a claim exists if the claim is "fairly debatable." *Dirks*, 465 N.W.2d at 861. If a claim is "fairly debatable," the insurer is entitled to debate the claim, whether the debate arises over an issue of fact or law. *Dolan*, 431 N.W.2d at 794. The Iowa Supreme Court has made clear an "insurance company has the right to debate claims that are 'fairly debatable' without being subject to a bad faith tort claim." *Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 150 (Iowa 1998). As the Iowa Supreme Court articulated in *Thompson v. U.S. Fidelity and Guaranty Co.*, 559 N.W.2d 288 (Iowa 1997):

> [T]he question of whether the fairly debatable issue [i]s one for the court or the jury depends on the facts of the individual case. We agree with the federal court of appeals in *Chadima* [*v. National Fidelity Life Insurance Co.*, 55 F.3d 345 (8th Cir. 1995)] which stated: "*Wetherbee* [(an Iowa case stating that issue may appropriately be decided by the court)] can be read as giving the trial court the opportunity to decide as a matter of law *in the appropriate circumstances* whether the insurer had a reasonable basis for denying the claim, *but not mandating the court to do so.*"

*Id.* at 290 (citing *Wetherbee v. Economy Fire & Cas. Co.*, 508 N.W.2d 657, 662 (Iowa 1993)) (emphasis in original). Thus, in cases where uncontroverted evidence shows that the claim was fairly debatable, i.e., the insurer had a reasonable basis for denying the claim, a court should make the determination that such claim is fairly debatable as a matter of law. *Id.* However, where there exists substantial evidence that the insurer lacked a reasonable basis for the denial, it is appropriate for the jury to decide whether the claim is fairly debatable. *Id.*

### 1. *State Farm's Reliance on Exhaustion Clause*

The Malaceks first argue in support of their Cross-Motion for Partial Summary Judgment that State Farm's denial of the Malaceks' UIM benefits claim was in bad faith as a matter of law because State Farm denied benefits until the Malaceks exhausted Huynh's insurance limits. The Malaceks contend only State Farm believes Huynh had any responsibility for the accident. The Malaceks assert any such "exhaustion" requirement in State Farm's insurance policy is void as a matter of well-established Iowa case law.

State Farm argues in response its denial of the Malaceks' claim for UIM benefits was based upon evidence the Malaceks did not sustain an underinsured loss. State Farm takes the position UIM coverage becomes available only when the driver causing the accident is underinsured. State Farm argues the policy language "bears out this reality," stating, under the policy, UIM benefits are paid only when persons from whom the insured is legally entitled to recover have insufficient liability limits. State Farm further asserts the Iowa Supreme Court has construed UIM coverage in a way in which it becomes applicable only when the insured party's loss exceeds the tortfeasors' liability coverage. Thus, State Farm contends the basic and inherent nature of UIM coverage is that UIM benefits are provided only when the persons who caused the loss have insufficient liability insurance to compensate the insured. In light of State Farm's understanding of its

14

obligation to pay UIM benefits, State Farm believes the legal issue in this case is not whether State Farm can force the Malaceks to "exhaust" the limits of other tortfeasors' insurance policies simply because State Farm thinks that coverage could be available, but rather whether State Farm had a reasonable basis to deny the Malaceks' claim for UIM benefits because some evidence demonstrated that Huynh, in addition to Buckallew, was a cause of the accident. State Farm contends if Huynh was a cause of the accident, then the Malaceks would not be entitled to UIM coverage until they exhausted the limits of Huynh's liability insurance coverage, which is $275,000.

In their reply brief, the Malaceks argue that a look at the undisputed facts demonstrates State Farm is in fact arguing the Malaceks must exhaust Huynh's policy limits before their own State Farm UIM coverage is available. The Malaceks allege the following facts are undisputed: (1) Buckallew rear-ended Consuelo and the Malaceks sued only Buckallew; (2) the Malaceks settled with Buckallew for his $25,000 policy limits with State Farm's approval; (3) Buckallew was the cause of the accident; (4) Consuelo's injuries exceeded Buckallew's $25,000 policy limits; and (5) Buckallew therefore is an underinsured motorist under the Malaceks' UIM policy. The Malaceks assert State Farm has never argued to the contrary and yet State Farm continues to assert the Malaceks must exhaust the $275,000 limits of Huynh's policy before UIM benefits become available to them. The Malaceks maintain State Farm's position in this regard is contrary to settled underinsurance law, and cites two cases, neither of which is a case decided under Iowa law, in support of this proposition. The Malaceks further contend the language of their UIM policy supports their position that, to be entitled to UIM benefits under the policy, they had to prove only that they were legally entitled to collect damages from one of the tortfeasors at fault for the accident who was without liability coverage sufficient to compensate the Malaceks for Consuelo's damages. The Malaceks assert this is true

15

regardless of whether another tortfeasor who potentially was at fault had adequate liability insurance limits to compensate the Malaceks for Consuelo's injuries. The Malaceks contend the language of the policy, which is written in the singular, allows consideration of only one tortfeasor's fault and strongly suggests the presence of only one underinsured tortfeasor gives rise to UIM coverage.

As previously noted, the Malaceks' UIM policy provides the following:

> We will pay damages for *bodily injury* an *insured* is legally entitled to collect from the owner or driver of an *underinsured motor vehicle*. The *bodily injury* must be caused by an accident arising out of the operation, maintenance or use of an *underinsured motor vehicle*.

Pl. App. at 2 (emphasis in original).

The court agrees with the Malaceks that the language of their UIM policy could be interpreted to mean the Malaceks are entitled to receive UIM benefits when they prove they are legally entitled to collect damages from the driver of an underinsured motor vehicle, regardless of whether they also are legally entitled to collect damages from the driver of a motor vehicle with liability insurance sufficient to compensate them for their injuries. This is especially true given the fact that, under Iowa law, "[w]hen two reasonable interpretations [of the terms of an insurance policy] exist, the policy is construed most favorably to the insured." *Am. Family Mut. Ins. Co. v. Peterson*, 679 N.W. 2d 571, 576 (Iowa 2004) (citing *United Fire & Cas. Co. v. Victoria*, 576 N.W.2d 118, 120-21 (Iowa 1998); *State Auto & Cas. Underwriters v. Hartford Accident & Indem. Co.*, 166 N.W. 2d 761, 763 (Iowa 1969) (noting when an insurance policy is susceptible to two interpretations, one that sustains coverage and one that does not, Iowa courts favor the construction that provides coverage)).

However, the court's research revealed no case in Iowa in which a court has ruled

that language similar to that used in the Malaceks' UIM policy requires payment of UIM benefits when there are multiple tortfeasors and the insured chooses to pursue only one tortfeasor who happens to be underinsured. The issue before the court is whether State Farm acted in bad faith when it took the position the Malaceks could not receive UIM benefits until they pursued Huynh, who may be at least partly at fault for the accident and who clearly had sufficient liability coverage to compensate the Malaceks. The court's review of the record in this case and the law governing the issue at hand leads the court to conclude it cannot rule as a matter of law State Farm's position in this regard was without a reasonable basis. Accordingly, the court declines to grant summary judgment in favor of the Malaceks on their claim for bad faith on this ground.

### 2. *State Farm's Failure to Exercise Its Right to Subrogation*

The Malaceks next move for summary judgment on the ground that State Farm acted in bad faith because there was no reasonable basis for State Farm's failure to pay to the Malaceks the amounts offered by Buckallew and Huynh and then pursue its subrogation right to the Malaceks' claims against these individuals in excess of the $25,000 offered by their insurance companies. The Malaceks argue, under Iowa law, the only way for State Farm to try to obtain from Huynh or her insurance carrier an amount in excess of the $1,000 offered in settlement was for State Farm to pay to the Malaceks the amount Huynh's insurance carrier offered in settlement and then to file a subrogation claim against Huynh. The Malaceks argue State Farm's approach to the Malaceks' claim merely is an effort to force the Malaceks to pursue a claim against Huynh using their own funds, which is impermissible under Iowa law. The Malaceks further argue State Farm waived any right to subrogation by failing to pay to the Malaceks any UIM benefits under their policy.

The court's review of the case law governing this issue revealed the Malaceks are correct in asserting State Farm could have paid to the Malaceks the amount of the

settlement offered by Buckallew's and Huynh's insurance companies and then exercised its subrogation rights with respect to any claim the Malaceks may have against Huynh. However, the court is not convinced this is the only course of action permissible under Iowa law. The Malaceks accepted the settlement with full knowledge State Farm had reserved the right to argue Huynh shared some fault for the Malaceks' damages, when they could have taken the matter to trial and had the issue of fault determined prior to seeking UIM benefits from State Farm. The court finds the Malaceks have failed to prove as a matter of law that State Farm's denial of the Malaceks' claim was not fairly debatable under Iowa law.

### 3. *State Farm's Failure to Provide UIM Benefits Based upon Facts*

Both the Malaceks and State Farm move for summary judgment on the issue of whether the facts upon which State Farm based its denial of UIM benefits provided a reasonable basis for State Farm's actions in this regard. State Farm moves for summary judgment, arguing it had a reasonable basis for determining Huynh could be considered at fault for Consuelo's injuries and therefore it was justified in denying the Malaceks' claim. State Farm asserts its review of the evidence available to it at the time the Malaceks made their claim justified State Farm's determination a jury reasonably could have found Huynh pushed the Buckallew vehicle into the Malacek vehicle, making Huynh largely responsible for the accident and for Consuelo's claimed injuries. Thus, State Farm posits it is proper in this case for the court to find as a matter of law State Farm had a reasonable basis for denying the Malaceks' claim.

The Malaceks argue in support of their Cross-Motion for Partial Summary Judgment on this ground that the way in which State Farm handled their file and the conclusions it reached were "fatally deficient." The Malaceks argue State Farm immediately took a position against them in this case and never waivered from the position in spite of

18

overwhelming evidence to the contrary. The Malaceks contend State Farm took this position while doing little or no investigation on its own. The Malaceks recognize an insufficient investigation does not, standing alone, give rise to a bad faith claim, but they assert State Farm's lack of investigation constitutes bad faith given the facts of this case. The Malaceks rely heavily on the fact State Farm received the report of an expert accident reconstructionist and did absolutely nothing in response to the report other than to deny the Malaceks' claim. The Malaceks assert State Farm had a duty either to acquiesce in their expert's finding or to hire an expert to respond to his findings and State Farm did neither of these things, but rather continued to deny the claim.

The court's review of the record submitted by both parties in support of and in resistance to their Cross-Motions for Partial Summary Judgment on this issue leads the court to conclude the issue of whether State Farm acted in bad faith in denying the Malaceks' claim for UIM benefits based on the facts State Farm had before it is one for the jury. The court finds there is a genuine issue of material fact regarding whether State Farm was entitled to debate Huynh's liability to the Malaceks given the amount of evidence the Malaceks produced to support their position Buckallew was at fault for Consuelo's injuries. Accordingly, the court denies the Malaceks' and State Farm's Cross-Motions for Partial Summary Judgment on the Malaceks' bad faith claim.

### *III. CONCLUSION*

In light of the foregoing, IT IS ORDERED:

1. State Farm's Motion for Partial Summary Judgment (docket no. 22) is DENIED.
2. The Malaceks' Cross-Motion for Partial Summary Judgment (docket no. 25) is DENIED.

3. This matter will proceed to trial during the two week period beginning on June 20, 2005.

4. The parties are encouraged to explore settlement prior to trial.

**SO ORDERED.**

**DATED** this 24th day of May, 2005.

_____
LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA